Good morning, Your Honors. May it please the Court. My name is Stuart Milch. I'm here representing Century Surety Company. This case asks the Court to answer the question it did not have to answer in CIMMEREX, that is, when parties to an oil field master services agreement agree to a floor of their mutual indemnity obligations but not a ceiling, how is the Court to determine a ceiling? How is the Court to determine what the indemnitore agreed to obtain for the benefit of the indemnity? That question can be answered using common rules of statutory and contractual interpretation by examining the master services agreement here and Colgate's insurance policies. In fact, CIMMEREX specifically says if there's no discernible ceiling from a master services agreement, the next logical step is to look at the policies. And the rule we're asking this Court to adopt is this. Unless the parties agreement or the insurance policies say otherwise, the limits of an indemnitore's obligation, the amount it agreed to obtain for the benefit of the other party is the amount of coverage purchased. In this case, yes, Your Honor? I'm listening. In this case, everyone agrees Colgate drafted a master services agreement that required each party to support its indemnity obligations with not less than $5 million. The agreement also said the obligations would not be limited by the amount of insurance purchased other than to the extent necessary to comply with state law. In other words, the Texas Oilfield Anti-Indemnity Act. Texas law places no limit on the amount of indemnity. What does the Court do next? Again, CIMMEREX says look at the policies. Colgate's policies say very specifically the limits of insurance are the general aggregate limits contained in the declarations. Let me ask a quick . . . I mean, I'll confess I do not have an answer to this, so I'm looking very much to both counsel here or to the Supreme Court of Texas. But did your client purchase one policy that would apply across various well sites that it serviced, or was it a different policy under each MSA for each different well site? I don't have the answer to that question, Your Honor. I'm sorry. I know that to support its indemnity obligations under this agreement, it purchased a primary policy and an excess policy. Whether that was across multiple well sites, I don't know the answer to that. Yeah, because I just think there are different ramifications if each party is buying broad general insurance as opposed to individual policies. Well, I mean, I don't know if this answers your question, but in terms of the parties buying broad general insurance, that was . . . Paragraph 12 of the Master Services Agreement, that's pages 213 and 214 of the record, Your Honor, required Triangle to buy insurance coverage for Colgate. Oh, I know. But it didn't require the same of Colgate. So if . . . and I think if you're trying to draw a distinction between insurance and indemnity, we see that in the Master Services Agreement. I see what you're saying. So Colgate did not buy insurance coverage for Triangle. Colgate bought insurance coverage for itself to cover whatever liabilities it might have, and I think we can agree that that's a different animal because buying insurance coverage for somebody and agreeing to cover them for whatever bad acts that there might be is a lot different than saying we're buying insurance to just cover this narrow slice of indemnity. Was the trial judge incorrect that there was no ceiling? Because he found $5 million was the bottom, but there's . . . I mean, to me, what your argument suggests is we just make up something. It's not in the insurance contract. It's not in the law. I don't know how we apply the case that decided that on a previous statute before it was amended, but why should we . . . it wouldn't be we just make it up law and not following the statute in the contracts if we were to say that because the client purchased more insurance, that you're entitled to benefit of that. Well, a couple of responses, Your Honor. First, I think where the trial court sort of went off the rails here was when it relied on Ken Petroleum to find the lowest common denominator of insurance, and the reason that was incorrect was because Ken Petroleum, as this Court recognized in Simerax, was interpreting a highly different statute, and where the statute that Ken Petroleum interpreted literally required the parties to agree to . . . . . . equal amounts of indemnity, and as the Supreme Court interpreted that in Ken Petroleum, that didn't mean everything had to match up. It just meant that there had to be some sort of common ground in the indemnity obligations. So, the district court's reliance on Ken Petroleum, it was wrong because there's a new statute, and as this Court held in or mentioned, pardon me, it's not going to take old case law interpreting an old version . . . But wasn't the district court consistent with the other state courts so far, or at least other federal district courts? I mean, he wasn't making that limit up, right? Well, he didn't make it up, but he was sort of . . . But there's a body of authority that supports his position. Under Ken Petroleum, it's . . . But, no, but I mean more recently, too, right? No, Your Honor, I don't believe so. Both statutes? Then everybody else in the oil patch has solved this problem? Well, what I would hope, Your Honor, is if you decide in our favor that . . . Yeah. I mean, if you decide in our favor, and I'm a general counsel for Colgate, or I'm a general counsel for Triangle, I revise my policy and make it a heck of a lot clearer that this is the floor, and this is the ceiling, and this is . . . I put numbers in the contract, but I don't . . . Ken Petroleum just can't guide the analysis anymore because it . . . Well, I certainly understand that argument. I was just saying I thought some courts had gone along with that even after the new statute. No, I think the most recent case, I believe the parties have cited interpreting anything. I mean, yes, there were district court, federal district court holdings, and there was a Houston Court of Appeals that referenced the new statute, but it was . . . the Ranger insurance case is the one I'm talking about from the Houston Court of Appeals, talked only about whether or not the agreements were . . . the master services agreement was a valid contract, not whether . . . what parties had agreed to in terms of a mutual indemnity obligation. Yeah. Speaking of numbers, let me interrupt one more time. How much is the judgment or settlement for this worker's injury? How much we . . . Between the two, it's $11 million, Your Honor. Oh, okay. I don't know why. Okay. We're not asking . . . I think the district court classified the indemnity ceiling as potentially a whopping $76 million. Well, we're not asking for $76 million. We're  You're asking for $5 million. We're asking for . . . I mean, if they're concerned, they've got another $64, $65 million on their policies, so we're not asking for a windfall here. But you could get one if, under your theory, say it was more than that, say it was a $50 million settlement, and you only had $5 million. You only had $5 million policy, and they got a $76 million policy. You'd be getting a windfall just because they provide more insurance. I guess I just don't see . . . I just don't understand how, just because somebody . . . So the moral of the story would be buy less insurance, you know, have lower limits, so you won't get stuck with a huge judgment. I mean, am I looking at that wrong? You're not looking at it incorrectly, and I have a couple of comments about that. Number one, I would reiterate the point that I made to Judge Jones, which is that if you hold our way, I don't think you see a case like this again, because the parties will go back to their general counsel and say, we have to make this a lot clearer than we did here. I hope that happens anyway. I'm sorry? I hope that happens anyway. I'm sorry, I lost my train of thought. I just didn't see how the . . . you know, somebody getting more insurance should benefit by . . . And in this case, it's . . . I mean, it would punish them to have more insurance, is what I'm saying. That would . . . I mean, I have to agree that that would be the effect. It's not a punishment. I mean, maybe it's a punishment for writing a contract that didn't have a ceiling, and then . . . Well, let's say it was $5 million minimum, and they could have got $5 million minimum, and they wouldn't have had to pay anything except the $5 million. Well, it . . . but that's just the floor, and I think the district court was right, but the contract doesn't say you can't get any more than $5 million. Why didn't your client have more insurance? I'm sorry, Your Honor? Why didn't your client have the minimum amount? Why does it? Yeah, I guess I just don't understand . . . Well, because . . . Why somebody who has 76 million . . . Because they're the little guy. Well, and . . . Theoretically. We're the little guy, and that was my next response to Your Honor's question, which is it's not so much a punishment as it is doing what the legislature intended when it enacted the Oil Field Anti-Andemnity Act, which was to protect the small contractor from overreaching by a larger oil field operator or owner, and that's exactly the situation we have here. And we're not operating in a vacuum. I understand that in Greene's, it was . . . we only had two statutes. We had more or less the original version or the 1987 version of the Anti-Indemnity Act, and then there was the 91 version, which required mutual indemnity obligations. But if you go back and look at the original act, it required indemnity obligations to the extent of the coverage in dollar limits of insurance the indemnitor has agreed to furnish. The next version was the mutual indemnity obligations. Now we're back to the indemnity obligation is limited to the extent of the coverage in dollar limits of insurance each party as indemnitor has agreed to obtain for the benefit of the other as indemnity. That's really similar to that 1987 version, which . . . and the Dallas Court of Appeals in Maxis Exploration, which we cited in our reply brief, and this court's decision in Campbell, both say that under the original version of the statute that I quoted, that an indemnitor who buys more than a required minimum can be liable for up to the amount that it purchased. And even more recently, Your Honor, in the Ironshore v. Aspen underwriting case, I don't believe any of the parties cited that, but I'm happy to provide a copy afterwards, but this court said, quote, Texas courts will not hesitate to award coverage beyond that contemplated by a service contract when the terms of the policy itself do not impose the same limits as the service contract. And that is exactly the situation we have here. The terms of the policy, say, at . . . this is page 299 of the record as the . . . this is the primacy policy, says limits of insurance. Limits of insurance are . . . You know, that might be the excess policy. Either way, it doesn't matter. Yeah. Because the limits of insurance paragraphs are identical in both contracts, and they both say the limits of insurance are essentially the general aggregate limits on the declarations page. For the primary policy, it's a million. For the excess policy, it's 75 million. And there is no other ceiling discernible other than . . . I have one more question, and I'll try to not mess you up too much on the time, but you know, doesn't the statute say that it's for the amount that they, quote, agreed to indemnify up to those higher limits . . . Absolutely. Yes. How can you say that they agree just by buying more insurance, or you say they agreed? Because there's no other evidence in this case of any other agreement. Well, that's right. I mean, Colgate . . . The contract doesn't reference it, does it? Well, true, but this contract, this is sort of the reverse of CIMARACS, because in CIMARACS, this court was able to say, well, those folks went out and bought these policies way before they entered into the master services agreement. But in this case, the master services agreement was entered into two years before Colgate went out and bought these policies. So Colgate knows it's got these indemnity obligations, and then it goes out and buys these two policies, the million and the $75 million. What . . . I mean, to use a cliché, you know, actions speak louder than words. If they went out and did this and bought this policy, why should . . . isn't that evidence of their intent that they agreed to do that?  Well, you have time for rebuttal. Yes, Your Honor. And the first question I'm going to ask Mr. Youngjohn is, what is . . . do you think, number one, does this case justify certification to the Texas Supreme Court, and number two, are you interested in that? Yes, on both questions, Your Honor. I think that certification to the Texas Supreme Court would be proper because this question is recurrent under Texas law. The Western District of Texas has touched on it three times most directly in Liberty Mutual. They followed Kim Petroleum. I'm certain that counsel for a century has come across it many times. The last time . . . well, the old statute, if you recall, the 1980 statute, was looked at by the Fifth Circuit in green, and they followed an analysis significantly different than what the Texas Supreme Court did in Kim Petroleum, and it was the same statute. It was a pre-1999 revision. In green, the Fifth Circuit looked at the word available insurance as a limitation on the indemnity obligation and knocked out the indemnity clause and held it invalid because available doesn't mean equal. Kim Petroleum, on very similar facts, where the MSA didn't contain any limitation at all on the insurance, then came up with the common denominator rule, so it does show that there are differences, obvious, between how the courts act, and I think that this would properly belong in Texas. I don't have an answer as I stand here, Your Honor. I believe what happened is there's an ancillary proceeding in state court that is abated because of this proceeding, but if I'm not mistaken, I believe that this was instituted by century in the U.S. District Court in Austin, and I removed it to Midland. I transferred the venue. One of the issues I'd like to point out is, the issue I have with the floor and the ceiling, and obviously I talk about it quite a bit in my briefing, is at the end of the day, we have an unambiguous document. It says not less than $5 million. Everybody knows what that means. That means $4 million doesn't cut it, but it doesn't obligate me to show up with $6 million. I think the thing about the search for the floor and the ceiling is it needs to happen within the four corners of this document, and if there's nothing in the MSA that amount is unambiguous, not less than $5 million, and as for the language not limited to the amount of insurance purchased, well, that means if I show up at $4 million, guess what? It's still $5 million. I underinsured. It doesn't forgive me, and that's consistent with the Supreme Court's decision and neighbors where they held that to be enforceable, all that needs to happen for the Master Service Agreement to be enforceable under the safe harbor exclusion of TOIA, is that the parties need only agree in writing that the indemnity obligation will be supported by liability insurance coverage to be furnished by the indemnitor. Now neighbors, the insurance company went bankrupt, and so there was no insurance, but yet the document itself was still enforceable upon its four corners, and so here there's no revision, there's no supplement, there's no amendment. The Colgate policy was purchased three years later. That controls the relationship between . . . I'm sorry, the Colgate-Markell policy was purchased three years later. That controls the relationship between Colgate and Markell. Triangle has no rights under that Markell policy. Triangle's only rights are within the MSA, and there's kind of a shapeshifting between the issue of contractual indemnification under the MSA and the coverage for insured contracts under the Markell policy. That's a first policy benefit for Colgate. Again, Triangle has no rights to sue on that, and so where I'm kind of going with this, this goes back to this accident happened in a multi-contractor environment. Mr. Miller chose to sue of those contractors, Triangle, and then of course the operator. He could have sued other contractors on that location who would have had similar paper, and we would have been obligated to indemnify and defend them as well under the contractual . . . under the indemnification contracts within the MSA. I don't know how we get from an unambiguous document into the consideration of extrinsic evidence. I think we violate the parole evidence rule, and there's simply no obligation within that document to pay more. That means the five million is both the floor and the ceiling? I'm sorry? That means the five million is both the floor and the ceiling? Yes, ma'am. It means the proper amount is five million. Now, at the end of the day, in the punch and the brown of settlement negotiations, Markell, who controlled Colgate's defense and who controlled the right to settle, elected to pay six million, and the total settlement was twelve million. Their interest is the five million that was paid by Century. But that was a decision made by Markell, not Colgate, and you can see in the record, Markell had their own coverage counsel involved in it, and who was involved in the negotiating the settlements. To get the Ken Petroleum, the Chapter 127 contains separate provisions for mutual indemnity agreements and unilateral indemnity agreements. Unilaterals capped, I think the amount's 750,000. For mutual indemnity agreements, you are allowed to contract in different amounts, but let's not forget that Texas, in contractual indemnification, is kind of disfavored in Texas. That's why we have the fair notice doctrine. We have express negligence. We have conspicuousness. These provisions are strictly construed. Where we don't have, if it's found to be nonspecific, and again, either it's ambiguous or it's not, I don't think that nonspecific is a specie of ambiguity, but if we decide that it is, then the issue is they're asking us to assume a unilateral indemnity obligation of about $70 million that's not set out clearly within the contract, and so if you look at CIMMEREX, they had disequal amounts. It plainly provided expressly in the contract that, hey, the operator's going to purchase $25,000, $26,000, the service company's going to purchase $3,000, and those were the facts that the court was faced with. In this instance, there's no comment on the amount at all other than not less than $5 million, and I would think absent an express agreement for unequal amounts, then to ensure the mutuality within Chapter 127, that we would look at Kemp Petroleum and adjust it to the lowest common denominator as, in essence, an implied agreement, although that term is not used in Kemp Petroleum. What else could it be? Do you even need to have it certified? I guess I don't see where the agreement was. The language says agreed upon. There's nothing in the insurance policy that makes it for the benefit of the party, for maximum amount. There's nothing . . . I guess I don't see how it was ever agreed upon. The statute doesn't say this is a ceiling. I mean, it says a bottom of $5 million. It doesn't say a ceiling. So, where was the agreement? Well, the agreement was the $5 million. I mean, other than that, where was anything beyond that? There was no agreement beyond that, and to look at the intention of the parties at the time of contracting, Bryson Davis . . . I know that they don't like my affidavits. Bryson Davis is Triangle's owner-operator, and he says unequivocally, there was no agreement beyond $5 million. John Bell, who is, I believe, in-house with Colgate, says unequivocally, there was no agreement beyond $5 million. So, if we're looking at the intention of the parties, I would think, Century's rights are no greater than Triangle's. I would think that those affidavits are consistent with the document as expressed. Absent anything in that document, an amendment, a revision, a supplement, an addendum, it's $5 million. Under the parole evidence rule, we don't look at the policies. I guess if the panel doesn't have any questions, I can cede the remainder of my time. I guess I was more economical than I realized. I guess one other thing I would say in the policy is that if we get to the point where we're looking into the policy, we will find language in there, and it benefits others. It's in the record at page 250. Century has pointed out, they say that this is talking about additional insured coverage, which they're not. Again, which is significant because that means they have no rights under this policy. The right for contractual insured contract coverage is a right to Colgate. But, it talks about, it limits coverage available for those Colgate has agreed to a written contract to provide liability insurance for, to the lesser of the limit required by said written contract or written agreement. Well, the limit required, the only thing required, was less than $5 million. I think that would operate to the extent that we're going into the policy. That operates to limit it to $5 million. I think, again, the issue of coverage, the coverage issue is between Colgate and Markell. It's not between Triangle and Markell. To say, I think that Cimerex maybe should have stopped with under the terms of that contract, there was a minimum of $26 required by the operator, a minimum of $3 required by the service company. There was no ambiguity and no evidence that more was required. It should have stopped there without ever going into coverage because it really wasn't a coverage issue. It was a question of interpretation of the insured contract indemnity language. Explain to me why your argument, and this is my own lapse of memory here. Why is your argument not inconsistent with Cimerex? Well, ultimately with Cimerex, my interest, I think it's footnote three where they reserve the issue of whether chem patrolling is still a valid law or not, but where I do think it is inaccurate or inconsistent, I'm not sure that the Fifth Circuit should have gone into the policies. Well, that's my . . . yeah. Because either the MSA is ambiguous or it's not. In absent ambiguity and absent . . . you get into the policy on an additional insured issue, you look at coverage. But with just a simple service contract, you don't really get into coverage. Either the indemnity agreement going back to neighbors, either . . . What do you mean with a simple service contract? Like what we have here with an indemnity provision and the parties are trying to safe harbor under TOIA. Well, isn't that what was going on in Cimerex? Well, it was, yes, but Cimerex made a comment that courts routinely look at coverage, which is correct, but I don't think in an issue where you're disputing the indemnity provision within a master service contract, that coverage, as neighbors shows, it doesn't even matter if there is no coverage. Either the provision's enforceable or it's not. Well, as you know, the author of Ken Petroleum was on the Cimerex panel. Judge Van Owen, now Richmond. Okay. Well, and perhaps that explains the footnote where it said it was unclear if Ken Petroleum survives the modification or not. But I mean . . . okay. But anyway, so if we don't look to the policy, are we not disagreeing with Cimerex? I would say you would be using a different methodology. That is correct. That's what I was . . . You would be using a different methodology. Okay. And I will surrender the rest of my time. All right. Thank you, sir. Thank you. Thank you, Your Honors. Let's . . . at first, I'd like to discuss the affidavits that counsel mentioned. And I think we can agree, first of all, that both the Fifth Circuit and the Texas Supreme Court say subjective evidence of intent is inappropriate. The courts can't consider subjective evidence of intent. In fact, that's what this Court said in Nelson against the Commissioner of Internal Revenue, citing URI against Kleberg. It's rather objective manifestations of intent control, not what one side or the other alleges they intended to say but did not. And now, I mean, we've got Mr. Bell who says we didn't intend to provide more than $5 million. He doesn't really explain what the rest of the policy is for. He just says his affidavit is conclusory and just tracks the language of the statute because that's the result they want to reach. And in fact, that is what the Texas Supreme Court sort of alluded to in the U.S. Polico case that we cited in our reply brief, which is, you know, parties to a business dispute can always find some sort of extra textual intent to suit a current litigation purpose. And that's what the Bell affidavit is doing. And as far as the Davis affidavit goes, Your Honor, you know, which affidavit? In June 2022, Mr. Davis, and this is pages 549 and 550 of the record, Mr. Bell assigns Century the right to commence this action. And he says, he writes that Triangle will reasonably cooperate with Century in its recovery efforts against Colgate and Colgate's insurers. And then a few months later, he goes and executes the affidavit for Colgate saying, oh, no, no, no, we didn't agree to provide more than $5 million or there wasn't an agreement to provide more than $5 million. Which affidavit are we talking about? So I don't think you can really count Mr. Davis' affidavit for anything. Um . . . Well, what's your opinion about certifying to the Texas Supreme Court? Well, I think . . . I think you don't have to because I think there's enough here based on the statutory language. And again, as I mentioned to Judge Doty earlier, I believe because we're not and because we have cases like Campbell and because we have cases like Ironshore from this court, it's not so much of a stretch. There's not so much of an eerie guess as it is . . . I mean, and I understand Campbell and Maxis Exploration haven't been cited in a while but, you know, again, we talked about the similarities between the 1987 statute and the current version and it's no stretch at all, I think, to sort of, if you will, revive those cases because they discuss exactly what the issue is here and find that because the indemnitore voluntarily exceeded the limit that was required by the contract, they can be liable for that amount of indemnity. And in fact, we should also be clear that Exhibit A of the Master Services Agreement, this is page 220 of the record, midway down the page, subsection B says, the parties are to obtain comprehensive general liability insurance coverage with limits of not less than . . . not less than language is important because it says you can't do . . . and counsel's right, you can't do less but the logical inference is you can do more and that's what Colgate did and that's why Maxis and Campbell and Ironshore are important because they all say when you voluntarily exceed that limit, you're on the hook for what you bought and that's what this Court should hold in this case. I can see why the affidavits, you know, shouldn't even be considered because they're parole evidence, you know, because of parole evidence, but I get the statutes, the amended statute that we're talking about. Am I correct that it still says the parties must agree . . . Yes. . . . to that? I mean, and I guess I just don't see where they agreed to that, anything. You know, they do the $5 million. Where did they agree to . . . just by getting the policy, you're saying they agreed just by getting a bigger policy, that they agreed to identify up to that amount by just getting the policy, nothing in writing? Well, Tianta, I'll say this, Your Honor. We all agree that this is an unambiguous agreement and an unambiguous insurance policy and Texas law says that in construing unambiguous contracts and the construing insurance policies, the court can look at objective evidence of intent to aid its understanding of the contract or the policy and the only objective evidence here, as I mentioned earlier, is the cliché, what did Colgate do, actions speak . . . I'm sorry, Your Honor. When you say what could Colgate do, you said they purchased a $76 million policy. That's your explanation, right? Correct. But they purchased it three years later and the rule of contract interpretation is you can look at a series of agreements to explain a contract, but it just does seem that when the contract could have easily said something and said nothing, that taking something that occurred three years later is dubious. I'm saying that's part of the party's agreement. At the same time, Your Honor, again, they entered the master services agreement two, three years before they bought the policy. They knew they had their indemnity obligation to support with insurance and then they went out and bought this policy. Other than that, there is no evidence of their intent or their agreement or . . . and when we're talking about the . . . and as I said, CIMREC says look at the policy. We don't have an agreement . . . May I ask you one more question since your time is up? Yes, Your Honor, please. More than once in your brief, you say as this court wrote in CIMREC, these questions are more appropriately answered by Texas courts in the first instance. We did say that and if this court . . . Are you backtracking on that today or what? I'm not backtracking. I'm just saying that if this . . . of course, if this court is not inclined to make an eerie guess, then of course, certification would be appropriate. Yeah. Okay. Thank you, Your Honor. Thank you.